UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **BAKER PETROLITE CORP.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **CIVIL ACTION No. 06-1749** |
| | § | |
| **GARY W. SPICER,** | § | |
| | § | |
| *Defendant.* | § | |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

Pending before the Court is Plaintiff's Motion for Preliminary Injunction (Dkt. #9). After considering the parties' arguments, the evidence, and the applicable law, the Court concludes that the Motion for Preliminary Injunction should be GRANTED in part and DENIED in part. Pursuant to Federal Rule of Civil Procedure 52(a), the Court now sets forth its Findings of Fact and Conclusions of Law in support of its decision.[1]

**Findings of Fact**

1.   Plaintiff, Baker Petrolite Corporation ("Baker"), is based in Sugar Land, Texas.

2.   Baker provides chemical, engineering, and technical services to the companies in the hydrocarbon recovery and processing industries. In conjunction with these services, Baker also sells various products, including corrosion inhibitors, biocides, and paraffin and scale inhibitors. Dkt. #9, Ex. A.

3.   On July 10, 2001, Defendant Gary Spicer ("Spicer") was offered the job of Account Manager with Baker.

---

[1] To the extent that any conclusion of law is more properly characterized as a finding of fact, and vice versa, the Court adopts it as such.

4.	On or about July 11, 2001, Spicer accepted the position and signed a document called "The Employment Relationship." Dkt. #1, Ex. A.

5.	In pertinent part, "The Employment Relationship," which was drafted by Baker, contained the following provisions:

> 3.	<u>Confidential Information</u>.
>
> A.	I understand that the Company possesses valuable business, technical and other information that is confidential, and sometimes referred to in this Agreement as "confidential information". Such information gives the Company a competitive advantage over others who do not possess such information. It includes, but is not limited to, information acquired from others under a confidentiality obligation, business and financial information, trade secrets, engineering and technical information, computer software and firmware, information about the development and performance of products and processes, customer lists and information related to manufacturing, purchasing, inventories, data processing, marketing, sales, and pricing. I further understand that such information also includes knowledge regarding the training, skills and abilities of the Company's employees.
>
> B.	Except as required by the Company, or otherwise express prior written permission of the Company, I will not disclose to anyone outside the Company, and will not use or permit others to use, any information which is confidential to the Company or which the Company is obligated to hold in confidence. I understand that this confidentiality obligation will continue even after my employment with the Company ends.
>
> C.	I will not disclose to the Company nor use information which is proprietary or confidential to another person or entity, including such information obtained from my former employers.
>
> 	***
>
> 6.	<u>Activities After the End of Employment</u>.
>
> A.	I expressly acknowledge that the Company has developed and established a valuable and extensive trade in its products and services, and that its customers, which have been established and retained at a substantial expense, are of great value to the Company. In addition, I further acknowledge that I have or will obtain information regarding Company's

customers and prospective customers, including, without limitation, customer buying contacts, methods of operations, and product needs, and will develop goodwill and rapport with customers and prospective customers of Company. In many instances the individuals at Company's customers and prospective customers responsible for the purchase of products, services and equipment sold by Company are also responsible for the purchase of products, service and equipment sold by Company's parent, affiliated and subsidiary companies. I understand that such information, goodwill and rapport, whether developed by me or by others, are valuable assets of Company.

B.     In order for Company to protect such information and relationships, if I am employed by Company in a sales or sales management capacity, then for the eighteen (18) consecutive calendar months immediately following the end of my employment with Company (irrespective of the reason), I shall not, directly or indirectly, for my benefit or the benefit of any other person or entity, call upon, communicate or attempt to communicate with any customer or prospective customer or any representative of any customer or prospective customer of Company with whom I had any contact or communication, or for which I had immediate supervisory responsibility during the eighteen (18) consecutive calendar months preceding the end of my employment with Company, if such contact or communication was with a view to, or for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment sold, offered for sale, provided, or under development by Company or any of its parent, subsidiary or affiliated companies.  As it relates to a Company's parent, subsidiary or affiliated companies, the foregoing proscription shall only apply where a customer or prospective customer or any representative of any customer or prospective customer of the Company is responsible for the purchase of the products, service, or equipment of Company is also responsible for the purchase of the products, services, or equipment of a Company's parent, subsidiary or affiliated companies. The eighteen (18) month period referred to herein, shall be extended by one (1) month for each month or portion of each month during which I am in violation of this paragraph. For purposes of this paragraph, the phrase "prospective customer of Company" shall include only those prospective customers to whom Company has made a written or verbal proposal during the twelve (12) consecutive calendar months preceding the end of my employment with the Company.

C.     In order for Company to protect such information and relationships, if I am employed by Company in other than a sales or sales management capacity, then for the eighteen (18) consecutive calendar months immediately following the end of my employment with the Company (irrespective of the

3

        reason), I shall not accept or continue employment with, or as a self employed person act as a competitor of Company, if any part of the duties of such employment or self-employment are such that I could reasonably be expected to reveal, base judgments upon, or otherwise disclose or use any of the proprietary and confidential information or trade secrets of Company or that of its parent, subsidiary or affiliated companies. The eighteen (18) month period referred to herein shall be extended by one (1) month for each month or portion of each month referred to herein during which I am in violation of this paragraph.

        D.    For the eighteen (18) consecutive calendar months immediately following the end of my employment with the Company (irrespective of the reason), I shall not induce, encourage, or solicit, either directly or indirectly, any other employee of the Company or that of its parent, subsidiary or affiliated companies to end their employment with Company or such other company. The eighteen (18) month period referred to herein, shall be extended by one (1) month for each month or portion of each month during which I am in violation of this paragraph.

6.    In its motion for preliminary injunction, Baker seeks to enforce three agreements:

    a.    the agreement not to compete found in paragraph 6, section B;

    b.    the agreement not to disclose confidential information found in paragraph 6, section C, and paragraph 3, section B; and

    c.    the agreement not to recruit Baker employees found in paragraph 6, section D.

7.    On or about July 11, 2001, Spicer received information and access to information regarding Baker's customers, including customer identities and customer contacts. Although Spicer received information or access to information regarding Baker's customers on July 11, 2006, there is no evidence that Spicer received any confidential or proprietary information at that time.

8.    Within approximately a week of July 11, 2001, Spicer was provided a laptop computer by Baker. The computer was password protected and programmed to "lock" after approximately fifteen minutes of inactivity. At this time, the evidence indicated conclusively that Spicer had access to confidential, proprietary, or otherwise secret information of Baker on the laptop.

9. Spicer worked at Baker until March 30, 2006, when he submitted his notice of resignation.

10. Prior to his resignation, Spicer notified Baker that he was considering a position with Multichem. Baker responded by offering Spicer more money in an attempt to persuade him to stay. Spicer indicated on or about March 27, 2006 that he would accept Baker's counter-offer and remain employed at Baker.

11. On March 30, 2006, Spicer attended a Baker meeting in Sugar Land, Texas. The meeting was designed as a strategy session to discuss Baker's new sales initiative, which involved a product directly competitive with Multichem. Within hours after attending the meeting, Spicer notified Baker of his intention to leave Baker to work for Multichem.

12. During his time at Baker, Spicer gained information regarding Baker's customer lists, customer buying contacts, customer methods of operation, and customer product needs. The Court finds that as a matter of fact, the information enumerated above is ascertainable from relevant industry directories, contacting the companies themselves, and/or otherwise available as common knowledge of one working in the industry. Although ascertainable, the information was valuable and useful to Spicer as a salesman in the industry.

13. In addition to certain non-confidential information, Spicer also received certain confidential, proprietary, or otherwise secret information during the course of his time at Baker. This information included, *inter alia*, specific marketing strategies, pricing considerations, and technical data regarding Baker's products.

14. After leaving Baker, Spicer went to work for a direct competitor of Baker named Multichem.

15. There is no evidence that Spicer has disclosed any confidential, proprietary, or otherwise secret information of Baker to Multichem or anyone else on Multichem's behalf.

16.     In his deposition, Spicer admitted that he has contacted companies during his employment with Multichem and on behalf of Multichem that were current Baker customers with whom he had contact while working at Baker.

17.     Spicer also admitted soliciting a Baker employee during Spicer's employment with Multichem and on behalf of Multichem. Specifically, Spicer contacted Darin Weis, a Baker Warehouse Foreman and Delivery Driver, in an attempt to persuade Weis to leave Baker and enter into an employment relationship with Multichem.  Weis declined the job offer.

18.     There is no evidence Spicer, while employed at Baker, sold, offered for sale, influenced the purchase of, or otherwise provided any product, service, or equipment competitive with any product, service, or equipment sold, offered for sale, provided, or under development by Baker.

### Conclusions of Law

1.     A preliminary injunction is an extraordinary remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion. *Harris County v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999).

2.     The movant must establish that (1) it has a substantial likelihood of prevailing on the merits; (2) there is a substantial threat that it will suffer irreparable injury if the preliminary injunction is denied; (3) the potential injury to the movant outweighs the potential injury posed by the injunction to the party proposed to be enjoined; (4) granting the preliminary injunction will not disserve the public interest. *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).

**Nonrecruitment Agreement**

3.     The employee nonrecruitment agreement at issue in this case is not a restraint of trade and, therefore, not subject to section 15.05(a) of the Texas Business and Commerce Code. *See Zep Mfg.*

*Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App.—Dallas 1992, no writ); *Totino v. Alexander & Assoc., Inc.*, 1998 WL 552818, at *8-9 (Tex. App.—Houston [1st Dist.]1998, no pet.); *see also Smith, Barney, Harris Upham & Co., Inc. v. Robinson*, 12 F.3d 515, 518 (5th Cir.1994) (applying similar Louisiana statute and finding that "nonrecruitment covenants . . . do not necessarily restrict a former employee's ability to compete . . . should not significantly restrain trade").

4.  Although not a restraint of trade, the nonrecruitment agreement does require consideration from Baker to be enforceable. *Olander v. Compass Bank*, 363 F.3d 560, 565 (5th Cir. 2004) (describing general requirements for consideration).

5.  Both Spicer and Baker made promises in the "The Employment Relationship."

6.  In "The Employment Relationship," Spicer promised that, for a period of eighteen months after leaving Baker, he would not: (1) recruit Baker employees; (2) disclose proprietary or confidential information; or (3) "communicate or attempt to communicate with any Baker customer or prospective customer with whom [Spicer] had any contact or communication, or for which [Spicer] had immediate supervisory responsibility during the eighteen (18) consecutive calendar months preceding the end of [Spicer's] employment with [Baker], if such contact or communication was with a view to, or for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment sold, offered for sale, provided, or under development by [Baker] or any of its parent, subsidiary or affiliated companies." Dkt. #1, Ex. A., ¶ 6, §§ A-C.

7.  In "The Employment Relationship," Spicer acknowledged that he "[had] or will obtain information regarding [Baker]'s customers and prospective customers, including, without limitation, customer buying contacts, methods of operations, and product needs, and will develop goodwill and

7

rapport with customers and prospective customers of [Baker]." *Id*. at § A. The Court finds that the language "will obtain information" constitutes a promise by Baker to provide the items and types of items that are enumerated in the remaining portions of the sentence. *See Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 468-69 (5th Cir. 2003) (treating acknowledgment by employee "that during the course of his employment . . . he will have access to confidential information, proprietary information and/or trade secrets" as promise to provide trade secrets); *Olander v. Compass Bank*, 363 F.3d 560, 566 n.15 (5th Cir. 2004) (unequivocally affirming that contract language at issue in *Guy Carpenter* represented an "explicit[] promise[] to provide confidential information to the employee"); *see also Oxford Global Resources, Inc. v. Weekley Cessnum*, Civ. No. 3:04-0330, 2005 WL 350580, *5 (N.D. Tex. February 8, 2005) (considering language providing that employer "has provided and will continue to provide" certain information and finding language sufficient to create a bilateral contract despite "the reference to past consideration").

8.      In addition to making the promise described above, Baker actually performed under the agreement by providing information to Spicer "regarding [Baker]'s customers and prospective customers, including, without limitation, customer buying contacts, methods of operations, and product needs . . . ."

9.      By soliciting Baker employee Darin Weis to work for Multichem, Spicer breached his agreement with Baker under "The Employment Relationship." As such, Baker has demonstrated a substantial likelihood of prevailing on the merits of its claim that Spicer breached the agreement not to recruit Baker employees.

10.     Baker has not *clearly* demonstrated that a *substantial* threat exists that it will suffer irreparable injury if the preliminary injunction as to this covenant is denied. Specifically, the Court concludes that Baker has not produced evidence that Spicer attempted to recruit or is actively

recruiting any other Baker employee apart from Darin Weis, whom the Court notes actually declined the offer of employment by Multichem. Moreover, Baker has not produced any evidence to demonstrate that an injury of this nature would be irreparable in any way. In particular, Baker did not establish or attempt to establish (1) the difficulty of recruiting employees like Weis, (2) the amount of money and time spent training such employees, or (3) any specialized knowledge that Baker employees of this nature have been provided that would make the loss irreparable and a remedy-at-law inadequate. Thus, Baker's request for this extraordinary remedy must be denied.

**Noncompete Agreement**

11. A covenant not to compete is in restraint of trade and is unenforceable as a matter of public policy unless it is reasonable. *Martin v. Credit Protec. Ass'n, Inc.*, 793 S.W.2d 667, 668 (Tex. 1990); TEX. BUS. & COM. CODE ANN. § 15.05(a) ("Every contract . . . in restraint of trade or commerce is unlawful.").

12. The Texas statute governing covenants not to compete provides:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

> TEX. BUS. & COM. CODE ANN. § 15.50.

13. The Texas Supreme Court has explained that "[s]ection 15.50 requires . . . two initial inquiries as to formation of the covenant not to compete: (1) is there an otherwise enforceable agreement, to which (2) the covenant not to compete is ancillary to or a part of at the time the agreement is made." *Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642, 644 (Tex. 1994).

14. There is an otherwise enforceable agreement. Both Spicer and Baker made promises in "The Employment Relationship." Spicer promised not to recruit Baker employees. Baker promised to

9

provide Spicer "information regarding [Baker]'s customers and prospective customers, including, without limitation, customer buying contacts, methods of operations, and product needs."

15. The requirement that the otherwise enforceable agreement exist "at the time the [noncompete] agreement is made" comes directly from the Texas statute. TEX. BUS. & COM. CODE ANN. § 15.50. Courts considering this requirement have been clear that promises by the employer that depend on continued employment of an at-will employee are illusory because the employee could be terminated by the employer at any time prior to performance. *Olander v. Compass Bank*, 363 F.3d 560, 565 (5th Cir. 2004). Although the Fifth Circuit has suggested any requirement of contemporaneous performance would defeat the intent of section 15.50, *see Provenzale*, 334 F.3d at 466, at least one Texas state court disagrees. *See TMC Worldwide, L.P. v. Gray*, 178 S.W.3d 29, 38-39 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (expressly stating that "the consideration be contemporaneously exchanged to make a promise . . . not illusory). Yet, even courts purporting to require a contemporaneous exchange acknowledge that performance "close to the time that the agreement was made" will suffice. *See Gray*, 178 S.W.3d at 38.

16. The otherwise enforceable agreement was enforceable at or sufficiently close to the time the non-compete was made. In particular, the Court finds that Baker performed and fulfilled its promise—to provide information regarding [Baker]'s customers and prospective customers, including, without limitation, customer buying contacts, methods of operations, and product needs—almost immediately after Spicer began his employment with Baker.

17. A two-part test applies in determining whether a noncompete agreement is "ancillary to or part of" an otherwise enforceable agreement. *See Light*, 883 S.W.2d at 647. First, the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing. *Id.* Second, the covenant must be designed to

10

enforce the employee's consideration or return promise in the otherwise enforceable agreement. *Id*.

18.     The noncompete agreement at issue in this case is not "ancillary to or part of" an otherwise enforceable agreement.

19.     First, the consideration given by Baker does not give rise to Baker's interest in restraining the employee from competing. In particular, the Court finds that Baker has not established that any of the information it promised to provide Spicer was confidential, proprietary, secret, or otherwise worthy of protection. Although information regarding Baker's customer buying contacts, customer methods of operations, and customer product needs provided Spicer with useful industry knowledge, the information is available from other sources, including industry directories and the actual customers themselves. Absent some confidential or proprietary information, the general information promised and provided to Spicer does not give rise to Baker's interest in restraining the employee from competing.

20.     Second, the covenant is not designed to enforce Spicer's return promise in the otherwise enforceable agreement. That is, the actual language and effect of the noncompete agreement does not enforce Spicer's return promise not to recruit Baker's employees. According to the plain grammatical meaning of the covenant, Spicer is only barred from competing with Baker for their customers or prospective customers under very narrow circumstances. The noncompete agreement only applies to Baker customers or prospective customers if Spicer, during his last eighteen months at Baker, sold, influenced the purchase of, or otherwise provided any product, service or equipment to Baker's customers or prospective customers competitive with any product, service or equipment sold, offered for sale, provided, or under development by Baker. The Court cannot conclude that this language is designed to enforce Spicer from recruiting Baker employees after Spicer has left Baker.

21.     Baker urges a different reading of the noncompete agreement than that described in the paragraph above. The sentence at issue reads as follows:

> In order for Company to protect such information and relationships, if I am employed by Company in a sales or sales management capacity, then for the eighteen (18) consecutive calendar months immediately following the end of my employment with Company (irrespective of the reason), I shall not, directly or indirectly, for my benefit or the benefit of any other person or entity, call upon, communicate or attempt to communicate with any customer or prospective customer or any representative of any customer or prospective customer of Company with whom I had any contact or communication, or for which I had immediate supervisory responsibility during the eighteen (18) consecutive calendar months preceding the end of my employment with Company, **if such contact or communication <u>was</u> with a view to, or for the purpose of selling, offering for sale, influencing the purchase of, or otherwise providing any product, service or equipment competitive with any product, service or equipment sold, offered for sale, provided, or under development by Company or any of its parent, subsidiary or affiliated companies**.

(emphasis added). According to Baker, the parties' intent would be defeated if the emphasized language were read to modify the "contact or communication" Spicer had with Baker's customers or prospective customer's during the eighteen months preceding the end of Spicer's employment with Baker. Baker insists that a grammatical reading of the emphasized language would render other provisions of the document meaningless and result in an unreasonable interpretation. The Court disagrees.

First, the Court notes that Baker itself, a large and sophisticated corporation, that chose the language of the noncompete agreement. Both the use by Baker of the past tense verb "was" and the parallel use of the phrase "contact or communication" indicate to the Court that the emphasized phrase modifies the nature of the relationships that Spicer had with Baker's customers or prospective customers during the eighteen months before Spicer left Baker.

Second, as both Spicer and Baker have noted, simply replacing the word "was" with "is" changes the meaning of the disputed phrase because the present tense verb suggests the phrase modifies that nature of Spicer's contact post-Baker. The differences in verb tense is a distinction that Baker recognizes. Indeed, Baker changed the verb tense from past to present tense when drafting

12

the TRO issued by the state court judge in this case, and has done so in other instances as well.[2] In oral argument, counsel for Baker represented to the Court that the different language was not intentional. Accepting this representation as true, the Court believes that this repeated and unintentional change in the language, at the very least, reflects a distinction that is natural and meaningful to Baker.

After considering "The Employment Relationship" as a whole, the Court finds that the plain and ordinary meaning of the noncompete agreement is unambiguous. Thus, the Court must enforce the document as written and reject the meaning urged by Baker.

22. Assuming that the noncompete agreement was enforceable, Baker has not provided any evidence that the covenant was breached by Spicer. In fact, Baker concedes that it has no evidence of any kind that Spicer sold or attempted to sell a competitor's products to Baker customers or prospective Baker customers during Spicer's last eighteen months at Baker. As such, Baker has not demonstrated that it has a substantial likelihood of prevailing on the merits of its claim that Spicer breached the noncompete agreement.

**Nondisclosure Agreement & Confidential Information**

23. Nondisclosure agreements are generally not considered to be restraints of trade under Texas law. *See ZEP Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App.—Houston [1st Dist.] 1988, no writ). However, certain agreements may be subject to Texas noncompetition statutes if the agreement has the practical effect of "prohibit[ing] the former employee from using, *in competition with the former employer*, the *general* knowledge, skill, and experience acquired in former employment," then it is more properly characterized as a noncompetition agreement. *Id*. (emphasis in original).

---

[2] Dkt. #18, Ex. A; Dkt. #14, Ex. A.

24. Confidential information is defined under "The Employment Relationship" as "information acquired from others under a confidentiality obligation, business and financial information, trade secrets, engineering and technical information, computer software and firmware, information about the development and performance of products and processes, customer lists and information related to manufacturing, purchasing, inventories, data processing, marketing, sales, and pricing."

24. There is no evidence before the Court to establish that Spicer has disclosed any confidential or proprietary information obtained or learned during his employment at Baker in violation of the nondisclosure covenants.

25. There is no evidence before the Court to establish that Spicer has disclosed any confidential or proprietary information obtained or learned during his employment at Baker in violation of duty owed to Baker independent of the "The Employment Relationship."

26. There is conclusive evidence that Spicer received certain confidential, proprietary or otherwise secret information during the course of his time at Baker. This information included, *inter alia*, business and financial information, trade secrets, engineering and technical information, computer software and firmware, and information about the development and performance of products and processes. Much of the confidential information obtained by Spicer is location specific for each customer. That is, Spicer has obtained confidential information regarding Baker's products and processes that is unique to specific oil fields of specific Baker customers.

27. The confidential, proprietary or otherwise secret information obtained by Spicer during the court of his employment does not amount to general knowledge.

28. By accepting employment with a direct competitor of Baker, Spicer placed himself in a position in which he could "reasonably be expected to reveal, base judgments upon, or otherwise disclose or use any of the proprietary and confidential information or trade secrets of [Baker]." As

such, the Court finds that Baker has sufficiently established a substantial likelihood of success on the merits.

29. Even assuming the best of good faith, Spicer will have difficulty preventing his knowledge of Baker's products and processes relating to specific locations and customers from infiltrating his work if Spicer works with those customers in those specific locations. Both Texas courts and the Fifth Circuit have recognized the need for injunctive relief in similar situations. *See FMC Corp. v. Varco Intern., Inc.*, 677 F.2d 500, 504-05 (5th Cir. 1982) ("The fact that a single trade secret may be disclosed is enough.") (citing *In Weed Eater, Inc. v. Dowling*, 562 S.W.2d 898, 902 (Tex. Civ. App.—Houston 1978, writ ref'd n.r.e.) (finding that employee could "hardly prevent his knowledge of his former employer's methods from showing up in his work").

30. There is no indication that Multichem has restricted Spicer's work location or in any way directed Spicer not to disclose confidential information obtained during the court of Spicer's employment with Baker.

31. Given that Baker has demonstrated certain confidential information and/or trade secrets that are worthy of protection, that Spicer has knowledge of at least some of those secrets, and that Spicer has been placed in a comparable position with a direct competitor without restriction against using or disclosing Baker's confidential information or trade secrets, the fear of irreparable injury is realistic. *See FMC Corp.*, 677 F.2d at 505.

32. The potential injury to Baker outweighs the potential injury posed by the injunction to Spicer. First, the potential injury to Baker could be significant. The evidence establishes that Baker and Multichem are direct competitors. As direct competitors, a Multichem salesman armed with Baker's confidential information, including specific technical knowledge about Baker's products and services used in a specific customer's location, could easily attempt or even succeed in taking some of Baker's business. That exposure of Baker's confidential information to a direct competitor poses a threat is

evidenced by the efforts taken by Baker to safeguard the information. Baker has password protected computers, the computers are designed to electronically lock after short periods of inactivity, and employees like Spicer are asked to sign nondisclosure agreements.

Second, the potential injury to Spicer posed by the injunction is not too great. The threat that Baker's confidential information will infiltrate Spicer's work largely applies to specific Baker customers, and only in the specific locations at which Spicer worked with those customers. Thus, Spicer will be free under the injunction to work with Baker customers in locations other than those in which he worked during the last eighteen months of his employment.[3] Considering the number of Baker customers in locations other than those at which Spicer has worked and the large number of non-Baker customers available to Spicer, the Court concludes that the limited injunction does not pose a significant injury to Spicer.

33. The injunction considered by the Court will not disserve the public interest. As the Fifth Circuit has explained in a similar circumstance, the public policy consideration at issue involves the balancing of an employee's right to advance his career by accepting the better offer of a competitor against the right of a corporation to protect its confidential information and trade secrets. *See FMC Corp.*, 677 F.2d at 505. Here, Spicer will not be prohibited from working with Multichem, or advancing his career in any way other than by the use of Baker's confidential information. Moreover, the limited injunction should serve to protect Baker's interests by preventing Spicer from disclosing confidential information and from working at those locations where Spicer would likely be unable to prevent his knowledge of Baker's confidential information or trade secrets from influencing his approach to the customers on behalf of Multichem. By striking a balance that serves both parties' interests, the public interest is not disserved.

---

[3]Of course, the obligation not to disclose Baker's confidential information will still apply in other locations.

16

## Conclusion

For the reasons outlined above, Plaintiff's Motion for Preliminary Injunction is hereby GRANTED in part and DENIED in part. Pending a trial on the merits in this case, Spicer is enjoined from disclosing any confidential information or trade secrets of Baker obtained during the his employment with Baker. Due to the inherent threat of disclosure, the nature of the information at issue, and the direct competitive relationship between Baker and Multichem, Spicer is further enjoined from working with Baker customers with which he had contact in a sales capacity during the last eighteen months of his employment with Baker. The restriction described above against Spicer working with Baker customers shall only extend to those specific locations at which Spicer worked with the Baker customers.

Signed at Houston, Texas on June 20, 2006.

_____
Gray H. Miller
United States District Judge